Gen. 347] 347

## TAXATION

### ADMISSIONS AND AMUSEMENT TAX − GAMING − BINGO − "INSTANT BINGO" RECEIPTS ARE NOT SUBJECT TO ADMISSIONS AND AMUSEMENT TAX

November 15, 1993

*The Honorable Robert R. Neall*
*County Executive for Anne Arundel County*

You have requested our opinion whether §4-102 of the Tax-General Article, Maryland Code ("TG" Article), authorizes Anne Arundel County to levy an admissions and amusement tax on the gross receipts derived from instant bingo. Your County Attorney recently opined that the State enabling law authorizes the county to tax receipts from the sale of instant bingo tickets.

Although we acknowledge that the question is a close one, we respectfully disagree with the conclusion reached by the County Attorney's Office. For the reasons stated below, we conclude that the charge for an instant bingo ticket is not an "admissions and amusement charge" within the scope of the admissions and amusement tax.

### I

### Admissions and Amusement Tax Statute

Maryland first enacted the admissions and amusement tax in 1936, as one of a series of emergency taxes to fund the cost of the State's welfare program during the Depression. The first admissions and amusement tax statute imposed a tax of one percent on the gross receipts of every person, firm, or corporation operating any place of amusement within the State for the following sales:

> [A]ny admissions tickets, cash admissions, charges or fees to any show, athletic event, contest, game, theater, moving picture parlor, opera, racetrack, skating rink, merry-go-round, roller coaster, amusement ride, whip, ferris wheel, snake, old mill, or other place of

> amusement including admission by season
> ticket or subscription.

Chapter 10, Sec. 3, Laws of Maryland 1936. In addition, a tax of one percent was imposed on the gross receipts from any admission or cover charge for seats or tables in a restaurant, hotel, cafe, night club, cabaret, roof garden, or similar place furnishing a floor show or other entertainment. If there was neither a separate charge for admission to such a place nor any cover charge, a tax of one percent was imposed on 20 percent of the gross receipts from the sale of refreshments, service, or merchandise. The one percent tax was also imposed on the gross receipts from the use of bowling alleys and pool and billiard tables. *Id.*

In 1947, although the tax remained a State tax, provision was made for distribution of revenues from the tax to the counties and incorporated municipalities. *See* Chapter 601, Laws of Maryland 1947. In addition to the State's tax, counties and incorporated municipalities were then authorized to levy their own tax on the same gross receipts, obtained from sources within their boundaries, that the State taxed.[1]

In 1949, the admissions and amusement tax provisions were generally rewritten and recodified in former Article 81, §§338 through 48. *See* Chapter 255, Laws of Maryland 1949. Former Article 81, §338 imposed a tax of 0.5 percent on the gross receipts of every person, firm or corporation derived from:

> [T]he amounts charged for (1) admission to any place, whether such admission be by single ticket, season ticket or subscription, (2) admission within an enclosure in addition to the initial charge for admission to such enclosure, (3) the use of sporting or recreation facilities or equipment, and (4) admission, cover charge for seats or tables, refreshment, service or merchandise at any roof garden, cabaret or other similar place where there is furnished a public performance when payment

---

[1] In Chapter 429 of the Laws of Maryland 1971, the admissions tax was changed from a State revenue source to a local revenue source.

> of such amounts entitles the patron thereof to be present during any portion of such performance.

While the General Assembly subsequently made other substantive and structural changes to the admissions and amusement tax statute, the basic description of these four categories of taxable admissions and amusements remained for over 30 years. The phrase "games of entertainment" did not appear in the statute until 1979, when it was tacked onto the third category of taxable charges. As thus amended, the tax was imposed on gross receipts derived from the "use of sporting or recreational facilities or equipment, including the rental of sporting or recreational equipment, *and games of entertainment."* Chapter 535, Laws of Maryland 1979.

On two separate occasions, the Maryland Tax Court has analyzed the legislative history of this amendment and found that the addition of the phrase "games of entertainment" was a simple clarification of the existing law and not a substantive change. *Ceeco Vending Co. and Rossville Vending Co. v. Comptroller*, Maryland Tax Court, Sales Tax Nos. 325 and 345 (June 22, 1988), *aff'd*, No. 1872, Sept. Term 1989 (Ct. of Spec. App. September 27, 1990) (unreported); *40 West Bingo Corp. v. Comptroller*, Maryland Tax Court Misc. No. 307 (June 8, 1984), *aff'd,* Case No. 84-CG-14 (Cir. Ct. for Balto. Co. May 1, 1985). When it added the phrase "games of entertainment," the Legislature had no intent to expand the scope of the statute. Rather, as the Tax Court held in *Ceeco Vending Co.,* the phrase was added to eliminate any uncertainty regarding the application of the tax to coin-operated amusement devices like video games. *Accord, 318 North Market Street, Inc. v. Comptroller*, 78 Md. App. 589, 597, 554 A.2d 453 (1989) ("The purpose of the [1979] amendment was to make clear that the admissions and amusement taxes applied to games of entertainment such as coin operated amusement devices.").

It was not until 1988, as a result of the recodification of the tax code, that the phrase "game of entertainment" was separated from the category originally established for the use or rental of sporting or recreational facilities or equipment. *See* Chapter 2, Laws of Maryland 1988. The Revisor's Note for the newly recodified provisions confirms that no substantive change was intended.

TG §4-102 now authorizes counties, municipal corporations, and the Maryland Stadium Authority to impose a tax on the gross receipts derived from any "admissions and amusement charge" within their respective jurisdictions. "Admissions and amusement charge" is defined in TG §4-101(b) to mean a charge for:

> (1) admission to a place, including any additional separate charge for admission within an enclosure;
>
> (2) use of a game of entertainment;
>
> (3) use of a recreational or sports facility;
>
> (4) use or rental of recreational or sports equipment; and
>
> (5) merchandise, refreshments, or a service sold or served in connection with entertainment at a nightclub or room in a hotel, restaurant, hall, or other place where dancing privileges, music, or other entertainment is provided.

In light of this legislative history and judicial interpretation, it is our view that the phrase "games of entertainment" was not intended by the General Assembly to expand the scope of the admissions and amusement tax to a new category of activity. Rather, the phrase was intended merely to clarify the application of the tax to those "games of entertainment" that require the use of a recreational or sports facility, or the use or rental of recreational or sports equipment.

## II

### Instant Bingo and Regular Bingo

As the County Attorney points out in his legal opinion on this matter, instant bingo bears a strong resemblance to the "instant lottery" offered by the State Lottery Agency. In instant bingo, an individual pays money to receive one or more small pre-printed tickets with five pull-tabs or scratch-offs. By pulling the tabs or

scratching off covered letters, the purchaser determines if the word "BINGO" appears on the ticket. The word "BINGO" entitles the purchaser to receive a money prize; the amount of money depends upon the background color of the letters. The definition of "instant bingo" in Article 16, §2-301(h) of the Anne Arundel County Code reflects this understanding of the nature of the game.

The only item used by the purchaser is the pull-tab or scratch-off ticket. The tickets can be sold anywhere, because no "facilities" or "equipment" are required. Only the ticket is required, the purchase of which essentially constitutes the "game."

By contrast, the traditional game of bingo is commonly played in lodges, halls, and church basements, or permanent "bingo parlors" and requires tables and chairs for the players as well as a variety of other equipment. Each player receives one or more bingo cards and chips or other markers to cover squares on the card. The game is further described as follows:

> The cards, made of cardboard or paper, are printed with five rows of five squares each. One letter of the word BINGO appears over each of the vertical columns. All of the squares contain a number, except the "free" center square. Numbers 1 through 75 are used. The "B" column usually contains any five numbers between 1 and 15; the "I" column, any five between 16 and 30; and so on.

> The purpose of the game is to cover enough called numbers to form a pattern – usually a vertical, horizontal, or diagonal line, or four corners. There are also many special games and gimmicks designed to increase participation.

Commission on the Review of the National Policy Toward Gambling, *Gambling in America* 160 (1976). This report goes on to describe the manner of play as follows:

> In a typical game, the announcer calls a letter and number, randomly selected from 75 ping-pong-type balls printed with a letter from the word BINGO and a number from 1 through 75, in the same groupings as the cards. As these numbers are called, the balls are placed on a master board containing all the letters and numbers to form a record of the game.

The game continues until someone forms a winning pattern, shouts "BINGO!," and claims the prize. *Id.*

The traditional game of bingo holds a unique position among the various forms of gambling, because many people do not consider it true gambling at all. *Id.* Bingo sessions are usually run or sponsored by charitable organizations and, therefore, people tend to attribute to it a respectability they would not accord other forms of gambling, such as numbers playing.

## III

### Inapplicability of Tax to Instant Bingo

The provisions of a tax statute may not be extended by implication beyond the clear import of the language employed; where there is doubt about the scope of the statute, it must be construed most strongly in favor of the citizen and against the taxing authority. *Comptroller v. John C. Louis Co., Inc.,* 285 Md. 527, 539, 404 A.2d 1045 (1979); *Scoville Service Inc. v. Comptroller*, 269 Md. 390, 396, 306 A.2d 534 (1973); *Pohlhaus v. Register of Wills*, 248 Md. 625, 630, 238 A.2d 91 (1968); *Comptroller v. Maryland Specialty Wire*, 37 Md. App. 528, 534, 378 A.2d 183 (1977).

Gross receipts from instant bingo are not taxable under enabling language that authorizes a tax on the "use of a recreational or sports facility" (TG §4-101(b)(3)) or the "use or rental of recreational or sports equipment" (TG §4-101(b)(4)). The question, therefore, is whether the addition of the words "games of entertainment" to the admissions and amusement tax law expanded the scope of the tax to encompass the charge for an instant bingo ticket, the "use" of which requires neither facilities nor equipment,

as a charge for the "use of a game of entertainment" (TG §4-101(b)(2)).

To be sure, the Comptroller and the Maryland Tax Court have determined that receipts derived from charges for a traditional game of bingo are subject to the admissions and amusement tax. It does not follow, however, that the result is the same for instant bingo. Indeed, the factual and legal differences between instant bingo and the traditional game of bingo are so significant as to cause us to reach a different result in applying the admissions and amusement tax.

The regular game of bingo is a "game" in the sense that there are procedures and rules that must be followed; time passes in the "playing" of the game; and a variety of equipment is necessary, including cards, markers, or blotters; ping pong balls; cages for the balls; and even television monitors and boards set up around the hall to record the numbers and letters chosen. There also must be a "facility" in which the game is played.

With instant bingo, by contrast, there are no rules or methods to follow, because there is nothing to "play." The amount of time involved is minimal, there is no "equipment" required other than the ticket itself,and there is no need for a "facility." The only real common denominator between the two activities is the word "BINGO." If the uncovered word on the instant play card were "APPLE" instead of "BINGO," it is unlikely any analogies would be claimed. The sale of instant bingo tickets is truly akin to the sale of instant lottery tickets, chance books, and raffle tickets, none of which are subject to the admissions and amusement tax.

These differences in the nature of instant bingo and traditional bingo are reflected in the gaming provisions of Article 27. Currently, 15 provisions specifically address bingo, covering 21 counties and Baltimore City. In five counties, including Anne Arundel, instant bingo is permitted. Article 27, §247(c) provides that "[i]n Anne Arundel County 'bingo' includes the game of instant bingo." *See also* §§ 254, 255B, 260(a), and 261(a). On the other hand, a provision for Baltimore County explicitly states that the term "bingo" does *not* include instant bingo. Article 27, §252(m). Instead, in Baltimore County, instant bingo is regulated under an entirely different section. *See* Article 27, §255(f)(3). In Harford

County, "bingo" includes the game of instant bingo, but does not include "members only" instant bingo. Article 27, §254(a).

What these different legislative provisions regarding instant bingo indicate to us is that there is no uniform legislative characterization of instant bingo, even for purposes of the gaming laws, let alone for purposes of the admissions and amusement tax. If the General Assembly thought that bingo and instant bingo were essentially the same game, there would have been no need for provisions like §247(c) that expressly include instant bingo within the authorization for bingo itself.

Moreover, the Court of Appeals has recognized the difference between bingo and other forms of gaming more comparable to instant bingo. *See Bender v. Arundel Arena,* 248 Md. 181, 190-91, 236 A.2d 7 (1967). The same distinction has been drawn by this office. *See* bill review letter on Senate Bill 10 *et al.,* at 2 (May 16, 1983) (advising that "prize limits for bingo contained in present law would appear to have no application to instant bingo"); letter of advice from Assistant Attorney General Robert A. Zarnoch to Norman Sheer, Esq. (January 16, 1979) (concluding that, under *Bender,* an "instant bingo game smacks more of a lottery than an ordinary bingo game" and therefore is not permitted under a law authorizing bingo).

Furthermore, the Comptroller's longstanding administrative practice has been to refrain from taxing receipts from the sale of instant bingo tickets, instant lottery tickets, chance books, and the like. Such a longstanding administrative practice is entitled to some weight. *Magan v. Medical Mut. Liab. Ins. Soc.,* 331 Md. 535, 546, 629 A.2d 626 (1993); *Comptroller v. John C. Louis Co., Inc.,* 285 Md. at 544-45. In the absence of any general legislative mandate that bingo and instant bingo be treated alike, it was reasonable and proper for the Comptroller to determine that the activities were sufficiently different to be treated differently for admissions and amusement tax purposes.

The history of the admissions and amusement tax demonstrates an intention to tax the charges for admission to *places* of amusement and the charges for the use of recreational *facilities* and *equipment,* as those terms are commonly understood. Pull-tab or scratch-off tickets are essentially nothing more than a representation of an intangible property interest, in the nature of a conditional right to

receive payment of prize money. *United States v. Mueller*, 178 F.2d 593, 594 (1949); *Hillstrom v. Commissioner of Revenue*, 270 N.W.2d 265, 267 (Minn. 1978). There is no indication of any legislative intent to tax receipts from the sale of chances to win prizes or money, regardless of the fact that some people derive fleeting enjoyment from buying such chances.[2]

## IV

## Conclusion

In summary, it is our opinion that the admissions and amusement tax does not apply to instant bingo in Anne Arundel County or anywhere else in Maryland.

J. Joseph Curran, Jr.
*Attorney General*

Deborah B. Bacharach
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*

---

[2] You have limited your inquiry to the sale of instant bingo tickets in a commercial bingo hall in Anne Arundel County, but we see no reasonable basis upon which the sale of instant bingo tickets can be distinguished for tax purposes from the sale (legal or illegal) of similar pull-tab tickets or chances under a wide variety of other circumstances. If receipts from the sale of instant bingo tickets are receipts derived from the use of "a game of entertainment" and are subject to the admissions and amusement tax, receipts from the sale of other types of chances must also be subject to the tax. However, we cannot conclude that this type of activity is subject to tax under the existing enabling language of TG §4-102 in the absence of any clear indication on the part of the General Assembly that it intended to tax these activities.